**Robert Paul BOUCHER et al.**

v.

**Roger N. BEGIN et al.**

**No. 96–422–M.P.**

Supreme Court of Rhode Island.

Jan. 27, 1997.

Bruce A. Wolpert, Providence, for Plaintiff.

Robert E. Craven, Providence, Francis X. Flaherty, Warwick, for Defendant.

## OPINION

BOURCIER, Justice.

This case came before us on a petition for certiorari filed by Robert Paul Boucher (Boucher), in his capacity as a Republican candidate for the General Assembly (sixty-second House Representative District), and John A. Holmes, Jr. (Holmes), in his capacity as Chairman of the Rhode Island Republican State Central Committee. On August 30, 1996, after a hearing wherein counsel for all parties presented oral arguments to this Court, we issued an order granting the petition for certiorari and quashing the decision of the State Board of Elections. In that order we also indicated that an opinion would follow setting forth the reasons for said order. The facts insofar as pertinent to this petition for certiorari are as follows.

Barbara Burlingame (Burlingame) is the current representative of the sixty-second House Representative District of the State of Rhode Island. On July 10, 1996, she submitted to the Boards of Canvassers for the Town of North Smithfield and the City of Woonsocket (collectively, the boards) her nomination papers for reelection to her General Assembly office. An affidavit signed by Burlingame accompanied the nomination papers, as required by G.L.1956 § 17–14–10. By her signature on the affidavit, Burlingame certified, under oath, that all of the signatures appearing on the nomination papers were signed in her presence. The affi-

davit and the nomination papers were submitted to the boards prior to the statutory filing deadline of July 12, 1996. *See* § 17–14–11 (statutory deadline is the sixtieth day before the primary).

On July 15, 1996, after the statutory deadline for the filing of nomination papers had passed, two additional affidavits were filed with the boards in connection with Burlingame's nomination papers. An affidavit signed by Esther R. Hutnak (Hutnak) was filed with the Board of Canvassers for the City of Woonsocket. That affidavit asserted that twenty signatures had been witnessed by Hutnak and not by Burlingame, contradicting Burlingame's affidavit originally filed with her nomination papers. An affidavit signed by Paula S. Kelly (Kelly) was submitted to the Board of Canvassers for the Town of North Smithfield, and that affidavit also asserted that several signatures had been witnessed by Kelly and not by Burlingame. As a result of the discrepancy between Burlingame's affidavit and the affidavits filed by Kelly and Hutnak, petitioner Boucher filed an objection to the validity of Burlingame's nomination papers.[1]

In response to the filed objection, the Board of Canvassers for the City of Woonsocket met on July 16, 1996, and the Board of Canvassers for the Town of North Smithfield met on July 18, 1996. The conclusion reached by both boards was that the subsequently filed affidavits contradicted the affidavit submitted originally by Burlingame, thereby establishing that a large number of signatures had not been signed in the presence of Burlingame. However, those subsequently filed affidavits had not been filed within the statutory filing date deadline and consequently could not retroactively serve to validate the voter signatures in question because of the earlier false affidavit. As a result, the boards found that only forty-eight valid signatures on Burlingame's nomination papers had been timely filed in support of her nomination, that number being two fewer than the fifty attested-to signatures neces-

---

1. In addition to objecting to Burlingame's nomination papers because the Hutnak and the Kelly affidavits contradicted Burlingame's affidavit, Boucher also objected to the fact that Kelly was a

minor and was therefore not eligible to witness signatures on nomination papers. That issue is not before this Court, however, and we need not, and do not, address it here.

sary to qualify a person as a Democratic candidate for the sixty-second Representative District of the Rhode Island General Assembly. *See* § 17–14–7(e).

Burlingame appealed both board decisions to the State Board of Elections. Counsel for Burlingame admitted at a hearing held on July 22, 1996, before the State Board of Elections that there was a "discrepancy" between her affidavit and the two subsequently filed affidavits and that Burlingame's affidavit originally filed was partially "erroneous." Despite those admissions, the State Board of Elections found that the General Laws permit latitude in the filing of affidavits with nomination papers. It consequently overruled the decisions of the Boards of Canvassers for the City of Woonsocket and the Town of North Smithfield and found that the filing of the Hutnak and the Kelly affidavits after the statutory deadline constituted sufficient compliance with the General Laws. A petition for writ of certiorari to this Court followed therefrom.

Burlingame as well as Roger N. Begin, William Shields, Rita Johnson, Judith Bailey, and Leo D. Blais in their capacities as members of the State Board of Elections (collectively, the respondents) assert before us that Burlingame complied with the "spirit" of the law as expressed in chapter 14 of title 17, pertaining to the nomination of party and independent candidates. They contend that the subsequently filed Kelly and Hutnak affidavits were only corrective affidavits and that the filing of the original affidavit together with the nomination papers constituted sufficient technical compliance with the law. The respondents are incorrect in their assertions.

■ Section 17–14–11 requires that "[e]ach nomination paper for party and independent candidates shall be submitted before four o'clock (4:00) p.m. on the sixtieth (60th) day before the primary to the local board of the city or town where the signers appear to be voters." Thus, the statutory deadline for the filing of nomination papers with the required number of voter signatures with the local boards is sixty days before the primary. Section 17–14–10 requires that

"[e]very person who shall obtain signatures of voters upon nomination papers shall under oath sign the following statement:

'I, _____, of _____, under oath, make affidavit and say that the signers of <u>the within nomination paper (or papers)</u> did so sign the paper (or papers) in my presence. \* \* \* Subscribed and sworn \* \* \*

---

Notary Public'" (Emphasis added.)

The statutory requirement that the gatherer of nomination signatures attest to the *"within nomination paper (or papers)"* clearly and unambiguously signifies that the affidavit/attestation be submitted to the canvassers *at the same time* as the submission of the nomination signatures. This Court has consistently held that the clear and unambiguous language of a statute must be applied literally, and we do so in this case. *Marran v. Baird,* 635 A.2d 1174, 1180 (R.I.1994).

■ Although there is no specific time requirement in § 17–14–10, a plain reading of § 17–14–10 together with § 17–14–11 compels the conclusion that the affidavits required by § 17–14–10 must be filed before the statutory deadline set for the filing of nomination papers in § 17–14–11. The statutory deadline is a mechanism to ensure that all nomination papers are administratively processed before the primary. The apparent legislative intent behind § 17–14–10 is to provide a method by means of which the validity of the signatures appearing on the nomination papers can be established. Thus, there can be no verification of the signatures on nomination papers until the affidavits are actually filed, which event, if one follows the interpretations of the State Board of Elections and the respondents, can take place at any time, even long after the statutory filing deadline. Under that interpretation of the law, the eligibility of a candidate and the sufficiency of the nomination papers would be indefinitely delayed until the affidavits were actually filed, thereby defeating the purpose of the statutory deadline for the filing of nomination papers. It is obviously necessary, therefore, that the affidavits attesting to the validity of the signatures appearing on the nomination papers be filed at

the same time as the nomination papers themselves, or before the deadline for filing the nomination papers, as we noted in *Vlasaty v. Rhode Island State Board of Elections*, 119 R.I. 52, 376 A.2d 320 (1977) (per curiam).

■ Accordingly, § 17–14–10 is not merely a procedural statute that can be waived so long as a potential candidate complies with the "spirit" of the law. It is a substantive statute that provides the necessary requirements for the filing of affidavits. That statute must be complied with, in fact and not in spirit, if a potential candidate's nomination papers are to be accepted and validated by a local board of canvassers.

The dissent interprets the statute differently. It believes the statute would permit the filing of nomination papers without any affidavit, using as example that in the event that "nomination papers are left with a family or at a nursing home for other voters to endorse," the required affidavits could be filed at any time thereafter. We believe that § 17–14–10 mandating the attestation affidavit was enacted to prevent that very occurrence.

Although all agree that there is no specific statutory direction contained in § 17–14–11 that specifically requires the nomination paper affidavit mandated by § 17–14–10 to be filed with or prior to the deadline for the filing of a candidate's nomination paper or papers, we find that specific legislative omission to be inconsequential when § 17–14–10 is read, as it must be, in conjunction with the particular *sequential* placement of the six statutory sections[2] prescribing the manner by which a candidate's nomination paper or papers are to be prepared and completed. Those sequential statutory sections, §§ 17–14–7,–8,–9,–10,–11, and –12 collectively provide for the clearly envisioned statutory candidate nomination procedure that a candidate must follow, beginning with the nomination paper itself, and the signing thereof, the number of voter signatures required therein in order to qualify the candidate, the affidavit (including the specific wording thereof) required of any person obtaining the voter signatures that appear on the nomination

paper, and the filing of the nomination paper prior to the statutory filing date and time deadline. We note in particular that the affidavit required of the person obtaining voter signatures is actually printed on the nomination paper itself, and requires that person to attest, under oath, that the persons whose signatures appear on that particular nomination paper did actually affix their signatures to the paper in the presence of the person executing the attestation affidavit.

We believe that the sequential statutory nomination paper, signature, affidavit, and filing time requirements should be read and construed together and with reference to one another. *State v. Austin,* 462 A.2d 359, 365 (R.I.1983). The dissent concludes otherwise and asserts that the required affidavit from the person obtaining the nomination paper signatures is simply evidentiary and can be filed at any time, including long after the deadline for filing the candidate's nomination paper. We disagree, and believe that in this particular case, the dissent appears to take, read, and apply each section in our election laws as being entirely unrelated to and independent of all other sections, notwithstanding their continuous and sequential placement in our election laws.

Our conclusion herein, based on the facts as presented in this petition, is consistent with our opinion in *Vlasaty.* In that case, we held that although one affidavit, filed with a potential candidate's nomination papers was false, that false affidavit did not taint the other additional affidavits that were also timely filed with the nomination papers. 119 R.I. at 58, 376 A.2d at 323. The additional affidavits in *Vlasaty* were all filed within the required statutory deadline and, considered together, provided sufficient verification for the required number of signatures thereon. We stated in a footnote, however, that "[i]f the additional affidavits had been submitted *after* the statutory deadline, the issue would be entirely different. We express no opinion as to that situation." *Id.* at 56 n. 2, 376 A.2d at 322 n. 2. That situation, singled out but not addressed in *Vlasaty,* is precisely the

---

**2.** We believe that G.L.1956 §§ 17–14–8–9, –10, –11, and –12 should be interpreted in their sequential entirety to ascertain the intention expressed therein.

issue that now presents itself to this Court on this petition.

Contrary to the respondents' assertions and the decision of the State Board of Elections, *Dahl v. Begin,* 660 A.2d 730 (R.I.1995), is not at all relevant to this present opinion. *Dahl* involved potential candidates who had entirely missed the deadline for the filing of their nomination papers, a materially different set of facts from those in the petition before us. Thus, only the footnote in *Vlasaty* is relevant as well as persuasive here.

Accordingly, because the Hutnak and the Kelly affidavits were filed *after* the deadline for the filing of Burlingame's nomination papers, those corrective affidavits could not be used to retroactively validate any of the signatures improperly appearing on her previously timely filed nomination papers. Since those affidavits were in direct contradiction to Burlingame's affidavit, Burlingame's admittedly false affidavit could not be then used to validate the signatures appearing thereon that were not offered in her presence. As a result, Burlingame did not have the requisite number of validated signatures to qualify her candidacy.

Although the only issue before this Court is whether an affidavit is valid if it is filed after the proper filing of nomination papers and after the statutory deadline set for the filing of nomination papers, we feel it is of significance, for purposes of future guidance, to highlight G.L.1956 § 17–23–17(a)(2), enacted after *Vlasaty* was decided. That statute provides that "(a) Any person shall be guilty of a felony who: * * *(2) Knowingly or without reasonable and proper investigation makes any substantial misstatement in any declaration of candidacy, nomination paper, or affidavit provided for in this title." *Id.* We decline to give our opinion as to whether that statute is applicable to Burlingame's situation because that particular issue is not squarely before us. However, we point out that the Hutnak and the Kelly affidavits directly contradict the affidavit that Burlingame signed under oath. As a legislator, Burlingame is presumed to know the law.[3] We leave to another forum the determination

of whether any violation of § 17–23–17(a)(2) has occurred.

In our previous order of August 30, 1996, in which we granted the petition for certiorari filed by Boucher and Holmes and quashed the decision of the State Board of Elections, we noted therein that an opinion giving our reasons for doing so would follow. This opinion setting forth those reasons augments that order.

The papers in this case may be remanded to the State Board of Elections with our opinion endorsed thereon.

FLANDERS, Justice, dissenting.

I respectfully disagree with the majority's conclusion that genuine and timely filed signatures of voters endorsing a candidate's nomination papers are invalid whenever their filing has not been accompanied by an affidavit prepared by some person who personally witnessed the signatures.

The applicable election laws establish three touchstones for validating signatures on nomination papers: (1) Have the nomination papers containing the signatures been filed sixty days before the primary, G.L.1956 § 17–14–11? (2) Can each signature be "reasonably identified to be the signature of the voter it purports to be," § 17–14–8? and (3) Are the voters who signed the nomination papers duly registered and qualified to vote as of the filing deadline so that their names appear on "the voting list as last canvassed or published according to law," § 17–14–11? There does not seem to be any dispute that these three criteria have been satisfied with respect to candidate Burlingame's nomination papers. Nonetheless, the majority holds that affidavits that are required under § 17–14–10 to be signed by persons who obtain signatures on nomination papers must also be filed with the election authorities by the deadline for filing nomination papers before the voters' signatures thereon can be accepted as valid. Because I can find no statutory requirement that affidavits be filed at all, let alone by the deadline for filing nomination

---

3. *See Benner v. J.H. Lynch & Sons, Inc.,* 641 A.2d 332 (R.I.1994); *Bakalakis v. Women & Infants'* *Hospital,* 619 A.2d 1105 (R.I.1993); *Bishop v. Jaworski,* 524 A.2d 1102 (R.I.1987).

papers, I do not believe this court should judicially impose such a requirement.

The majority claims that a § 17–14–10 affidavit's statutorily required text (attesting "that the signers of *the within nomination paper (or papers)* did so sign the paper (or papers) in my presence") "clearly and unambiguously signifies that the affidavit/attestation be submitted to the canvassers *at the same time* as the submission of the nomination signatures." (Emphasis added by the majority.) But merely because all § 17–14–10 affidavits must include, as part of their text, a reference to "the within nomination paper (or papers)," it does not follow that all nomination signatures must therefore have § 17–14–10 affidavits to be valid or that no nomination papers can be filed without such affidavits.

Indeed, even if all § 17–14–10 affidavits had to have nomination signatures "within" them, one would not be entitled to conclude that all nomination signatures had to be accompanied by § 17–14–10 affidavits. Because there is no requirement in § 17–14–10 or elsewhere that the signatures on nomination papers be attested to by affidavits, a fortiori not all nomination papers have to be accompanied by affidavits.

This court expressly rejected this same argument in *Vlasaty v. Rhode Island State Board of Elections,* 119 R.I. 52, 376 A.2d 320 (1977). There this court refused to invalidate signatures on nomination papers merely because the affidavits attesting to their validity had not been submitted with or at the same time as the nomination papers, much less "within" or on the nomination papers themselves. *See id.* at 58–59, 376 A.2d at 323. Moreover, the additional affidavits that were filed in *Vlasaty* contained no "signatures thereon." Rather the supplemental affidavits "did not appear on the nomination papers themselves but instead contained only handwritten notes specifying to which signatures they referred." *Id.* at 58, 376 A.2d at 323. Thus, the majority's contention that § 17–14–10 "clearly and unambiguously signifies that the affidavit/attestation be submitted * * * *at the same time* as the submission of the nomination papers" was considered

and expressly rejected by this court in *Vlasaty.*

Although the customary practice might be to include an affidavit as part of the form used to obtain voters' signatures on nomination papers, the election laws do not require this inclusion before signatures may be validated. *Id.* at 59, 376 A.2d at 323 ("Section 17–14–10 does not regulate anything but the text to be used [for affidavits]. *The mere fact that the text [for affidavits] is usually printed on the nomination papers does not make such printing a statutory requirement,"* (emphasis added)). In *Vlasaty,* affidavits were submitted *after* the nomination papers had been filed (albeit before the deadline for filing nomination papers had expired), yet the court did not invalidate the otherwise genuine voters' endorsements merely because they were not "accompanied" by affidavits when they were filed. Thus, when local boards check the signatures on nomination papers, their charge is not to see if there is an accompanying affidavit verifying that the signatures were signed in the presence of some affiant. Rather their function is to "certify the number of names appearing thereon that are in conformity with the requirements of § 17–14–8." Section 17–14–11. But § 17–14–8 contains no requirement that each signature must have been witnessed by another person (let alone an affiant) before it can be accepted as valid. On the contrary, so long as each signature "can be reasonably identified to be the signature of the voter it purports to be," it "*shall* be accepted as valid" under § 17–14–8 even if no affidavit has been signed or filed and even if no other person has witnessed the signature. This court has consistently held that clear and unambiguous statutory language must be applied literally. *Marran v. Baird,* 635 A.2d 1174, 1180 (R.I.1994). Accordingly, because all the signatures on Burlingame's nomination papers "can be reasonably identified to be the signature[s] of the voter[s] [they] purport * * * to be," § 17–14–8 mandates that the signatures be accepted as valid irrespective of any conflicting or late-filed affidavits.

I also disagree with the majority's statement that "the dissent appears to take, read,

and apply each section in our election laws as being entirely unrelated to and independent of all other sections, notwithstanding their continuous and sequential placement in our election laws." On the contrary, there has been no attempt here to read the election laws as "entirely unrelated to and independent of all other sections" of these laws. Rather, every relevant section of the election laws has been construed as consistent with every other section, no pertinent language has been ignored, and most importantly I have not added any new requirements or conditions for qualifying either candidates or nomination signatures that are not set forth in the election laws themselves.

In sum, with respect to the affidavit set forth in § 17–14–10, the only requirement is that "[e]very person who shall obtain signatures of voters upon nomination papers shall under oath sign" an affidavit stating that the nomination papers of the candidate were signed in his or her presence. There is no requirement in § 17–14–10 or elsewhere that the affidavit be filed, let alone that it be filed by the deadline for filing nomination papers. Indeed, absent written objections to the eligibility of the candidate or the sufficiency of the nomination papers, the signatures on these papers "shall be conclusively presumed to be valid." Section 17–14–13. If such signatures could not be accepted as valid unless they had been obtained and personally witnessed by some third party who swore that the signing took place in his or her presence, then either § 17–14–8 or some other provision of our election laws would say so. But they say no such thing. Even though such a requirement would certainly be a reasonable if not an altogether salutary addition to our election laws, it is scarcely our province to graft it on judicially merely because we think it highly desirable. Courts "do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it." *Anderson v. Wilson,* 289 U.S. 20, 27, 53 S.Ct. 417, 420, 77 L.Ed. 1004, 1010 (1933) (Cardozo, J.).

To be sure, one way that these signatures on nomination papers can be "reasonably identified" as genuine is through the use of a § 17–14–10 affidavit. But it is hardly the only way. More importantly, it is not the way compelled by our election laws. Section 17–14–11 states that the signatures on nomination papers are to be checked "against the voting list as last canvassed or published according to law." If the signatures are challenged, the voters in question, the individuals who witnessed their signatures, or any others who are familiar with the voters' handwriting can submit § 17–14–10 affidavits or even testify concerning the identification of any challenged signature as belonging to "the voter it purports to be." *See* § 17–14–8. Hearings convened by local and state boards of elections can be conducted for this purpose. *See* §§ 17–14–11 and 17–14–14. Thus if nomination signatures are challenged, any § 17–14–10 affidavits can be filed (but need not be) and used as evidence at any hearings held pursuant to §§ 17–14–11 and 17–14–14 on objections to nomination papers.

The majority's opinion assumes that "there can be no verification of the signatures on the nomination papers until the affidavits are actually filed." I disagree because a mere comparison with a voter's signature card would suffice reasonably to identify the signatures as genuine, as would resort to any of the other, alternative means for doing so that are specified in the above-cited election laws. This is so because the affidavit requirement is merely an evidentiary one: if signatures are challenged, the affidavit required of any person who obtained them *can* be submitted to the election authorities as evidence that reasonably identifies the signatures as those of the voters they purport to be. The affidavit requirement also acts as a check on fraud and forgery by requiring those who obtain voters' signatures on nomination papers to verify in writing that the signing occurred in their presence. Note also that because the election laws do not require voters to endorse a candidate's nomination papers before a third-party witness, it is only people who obtain such signatures that are required to execute affidavits. In circumstances in which no one obtains a particular voter's signature or witnesses the signing (as, for example, when nomination papers are left with a family or at a nursing home for other voters to endorse), no such affidavit can or

need be executed. I disagree with the majority's opinion that § 17–14–10 "was enacted to prevent that very occurrence" because I can find no statutory language, no legislative history, and no other support whatsoever for this proposition.

Because the election laws as they are presently written do not require § 17–14–10 affidavits to be filed at all, much less by any deadline for the filing of the nomination papers, it follows that the corrective affidavits submitted by candidate Burlingame were not untimely and that the State Board of Elections properly considered them to validate the challenged signatures as those of properly registered voters. Indeed, instead of using the Hutnak and the Kelly affidavits to make this determination, the board could have reasonably verified the signatures by other available means, including a comparison of the signatures with those on the voters' registration cards or the taking of testimony from witnesses with personal knowledge of the signatures.

Thus candidate Burlingame's erroneous affidavit wherein she stated that all the voters in her nomination papers signed their signatures in her presence should not have been fatal to her candidacy, much less to the only question that should have been properly considered by the election officials: Were the signatures on her timely filed nomination papers genuinely those of the qualified voters they purport to be?

Because it is undisputed that these signatures were the genuine endorsements of properly registered voters and that these signatures were timely filed with candidate Burlingame's nomination papers, the certification task of the election authorities under § 17–14–8 was over and they were duty bound to certify the signatures as valid irrespective of any conflicting or supposedly untimely filed affidavits.[4]

For these reasons I would have denied the petition for certiorari, quashed the writ previously issued as improvidently granted, and sustained the decision of the Board of Elections that candidate Burlingame has submitted the requisite number of valid signatures on her nomination papers to qualify as a candidate for the Sixty-second Representative District of the Rhode Island General Assembly.

---

4. Whether the submission of a false affidavit violated any other laws is a different matter that can and should be dealt with separately and apart from the question of whether the voters' signatures on candidate Burlingame's nomination papers were valid and timely filed.